360 So.2d 807 (1978)
Robert P. WAGES, C.P. Watson Co., Inc. and United States Fidelity & Guaranty Company, Appellants,
v.
Frank SNELL, and His Wife, Thelma Snell, Appellees.
No. FF-416.
District Court of Appeal of Florida, First District.
July 18, 1978.
*808 J. Robert Hughes of Barron, Redding, Boggs & Hughes, Panama City, for appellants.
Jackson G. Beatty, Tallahassee, for appellees.
PER CURIAM.
Appellants, defendants below, claim that the trial court committed reversible error by admitting into evidence mortality tables for the purpose of showing Appellee Frank Snell's life expectancy and by instructing the jury so as to permit a verdict of damages on the basis of permanent injuries. Appellants claim that there was insufficient evidence of any permanent injury sustained by Mr. Snell.
Mr. Snell was injured in an automobile accident on September 12, 1975, he then being 67 years old. The injuries appeared at first to be relatively minor. However, during the next month, he suffered from various symptoms including severe headaches, nausea, vomiting and a staggering gait. On one occasion he fell to the floor and was unable to get up without assistance. Following the fall, he sustained a loss of consciousness and was taken to a hospital in Dothan, Alabama on October 11, 1975. His condition was diagnosed as bilateral subdural hematomas described as bleeding on the outer portion of the brain which caused a pocket of blood to form between the brain and the skull and resulted in pressure on the brain. A neurosurgeon drilled four holes approximating the size of a penny in Mr. Snell's skull, two on each side, and left a closed continuous drainage system to drain the blood so as to permit the brain to re-expand and take up the space occupied by the hematomas. The closed drainage system was removed three days later. The surgery was effective in improving Mr. Snell's condition such that he was discharged from the hospital on October 23, 1975.
At the trial on January 31, 1977, Mr. Snell, his wife and neighbors testified concerning his activities and capabilities after his discharge from the hospital in comparison with his activities and capabilities before the accident. There was testimony that Mr. Snell had been a farmer for many years and that, since the accident, he had been unable to perform even routine farming chores. There was also evidence that Mr. Snell was noticeably slower mentally during the sixteen months between the accident and the trial than before the accident. During his testimony, Mr. Snell displayed to the jury the indentations in his head caused by the four penny size holes which remained in his skull.
Mr. Snell's neurosurgeon testified that two brain wave studies were done, one on October 20, 1975 shortly after the surgery and the other some ten months later. He testified that the first EEG was abnormal as a result of the injury. He stated that the second EEG still showed abnormality bilaterally representing "cortical dysfunction of a diffuse nature." The neurosurgeon further testified:
"[W]hat we are losing here is the higher integrated functions: thinking, mentation, understanding, recognition of a hazardous situation, how long he can hold out, how good your arithmetic is, how well you can balance your checkbook, how much you understand what you read in the paper ... how much mentality is left... ."
* * * * * *

*809 "To me the abnormal EEG suggest that some of the mental changes and reduced capabilities can be attributable to the accident and the subsequent blood clot."
* * * * * *
"Certainly, arterio-sclerosis can produce all these things, all these changes, but you have to consider what I feel is the probability that acceleration of removal from the work-force was precipitated by the accident."
The neurosurgeon stated that if the change had been attributable to the arterio-sclerotic condition, the arterio-sclerotic changes would have been "more insidious and slower."
Appellants argue that before a jury may assess damages for any permanent injury, it must appear that the injury is reasonably certain to impair the health and earning capacity of the injured person in the future, and not merely that it will apparently affect the health and earning capacity of the injured party, and that mortality tables are not admissible in the absence of evidence of permanent injury, relying upon Baggett v. Davis, 124 Fla. 701, 169 So. 372 (1936); Ward v. Stanley, 130 Fla. 642, 178 So. 398 (1938); Seaboard Air Line Railroad Co. v. Ford, 92 So.2d 160 (Fla. 1956). We agree with the above propositions of law urged by Appellants. However, we disagree with Appellant's position that the evidence at trial failed to satisfy the above requirements. The testimony referred to above of the lay witnesses and the neurosurgeon was sufficient from which the jury could find that Mr. Snell sustained permanent injury and that his health and earning capacity were permanently impaired.
We therefore conclude that the trial court did not err in admitting the mortality tables as evidence of Mr. Snell's life expectancy and that the jury was properly instructed as to the various elements of "future" damages.
Appellants complain also that error occurred by the court's refusal to submit special jury forms to the jury pertaining to comparative negligence, relying upon Lawrence v. Florida East Coast Railroad Co., 346 So.2d 1012 (Fla. 1977). The Lawrence opinion, filed subsequent to the trial of this cause, held the requirement of special verdicts in comparative negligence cases was prospective only from the effective date of the decision. Lawrence v. Florida East Coast Railroad Co., supra, at 1017. Clearly then it had no application to this case.
Appellants also urge that certain examples included in the court's instructions, pertaining to comparative negligence, were error. Just after giving the standard instruction concerning comparative negligence, the trial court gave explanatory examples, using $100 as a base figure to explain the percentage of 80% negligence and 20% negligence, and 60% to 40% negligence. It is clear, from the context of the statements made, the charges were explanatory and were only examples. We reject the argument they were error. The standard for determining error in jury instructions is whether the instructions as a whole fairly state the law. Grimm v. Prudence Mutual Cas. Co., 243 So.2d 140 (Fla. 1971). Even if the examples were error, however, it is clear from the record that appellants failed to make timely objections. At the conclusion of the instructions given, no objection was stated in the record by either counsel and it was not until the jury retired to begin its deliberations that objection was made.
This case is very similar in its facts to Page v. Cory Corp., 347 So.2d 817 (Fla. 3rd DCA 1977), where counsel for one of the parties objected to the giving of a comparative negligence charge to the jury after the jury had retired. The Third District Court of Appeal held that since counsel did not object to the charges until the jury was in the process of considering its verdict, the objection was not timely and could not be considered on appeal.
We also conclude that appellants' third point, alleging the evidence is insufficient to support the verdict of the jury, is without merit.
AFFIRMED.
*810 ERVIN, Acting C.J., MELVIN, J., and NIMMONS, RALPH W., Jr., Associate Judge, concur.